Dissenting opinion filed by Circuit Judge Newman.
Wallach, Circuit Judge
Appellants Laura Oliver and Eddie Oliver, Jr. (together, "the Olivers"), parents and legal representatives of E.O., III ("E.O."), sued the Secretary of Health and Human Services ("the Government") for compensation under the National Childhood Vaccine Injury Act of 1986 ("Vaccine Act"), Pub. L. No. 99-660, 100 Stat. 3755 (codified as amended at 42 U.S.C. §§ 300aa-2 - 300aa-33 (2012) ). The Olivers allege that E.O. developed Dravet syndrome[1] as a result of certain vaccinations. The Chief Special Master of the U.S. Court of Federal Claims determined that, inter alia, the Olivers "failed to show by preponderant evidence that E.O.'s injuries were caused by his ... vaccinations," such that the Olivers were not entitled to compensation. Oliver v. Sec'y of Health & Human Servs. (Oliver I ), No. 10-394V, 2017 WL 747846, at *2 (Fed. Cl. Feb. 1, 2017).
*1360 The Olivers filed a motion for review in the Court of Federal Claims, and the Court of Federal Claims denied it. See Oliver v. Sec'y of Health & Human Servs. (Oliver II ), 133 Fed.Cl. 341, 344 (2017) ; see also J.A. 52 (Judgment).
The Olivers appeal. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(3) (2012). We affirm.
BACKGROUND [2]
On April 9, 2009, E.O. visited a pediatrician for his six-month visit and received vaccinations for Diphtheria-Tetanus-acellular Pertussis, Hepatitis B, Inactivated Poliovirus, Pneumococcal Conjugate, and Rotavirus. Oliver I , 2017 WL 747846, at *4. At approximately 11:30 PM that night, Mrs. Oliver "found E.O. seizing in his bed" and called 9-1-1. Id. (citation omitted). When he arrived at the emergency room, E.O. presented with "a fever of 101.3 degrees, red eyes with discharge from his right eye, and a runny nose." Id. (internal quotation marks and citation omitted). The emergency room physician diagnosed E.O. with a febrile seizure and discharged E.O. with instructions to see his pediatrician. Id . On April 10, 2009, E.O.'s pediatrician recorded E.O.'s temperature as 97.1 degrees and diagnosed E.O. with "complex febrile seizure and conjunctivitis in the right eye." Id. (citation omitted).
"E.O. did not have any health issues or seizures for the next two months." Id. However, E.O. had several seizures over the summer of 2009 and began to experience prolonged seizures in March 2010, with each seizure resulting in an emergency room visit. Id. at *5. In April 2010, E.O. was referred to a pediatric neurologist, who diagnosed E.O. with an SCN1A gene defect in June 2010. Id. at *5-6. In July 2010, E.O. began to exhibit developmental delay, and the pediatric neurologist performed general physical, neurological, and motor examinations, which demonstrated "intractable, symptomatic childhood absence and complex partial seizures of independent hemisphere origin secondary to SCN1A gene defect (borderline SMEI syndrome) and encephalopathy characterized by speech delay." Id. at *6 (internal quotation marks and citation omitted).
DISCUSSION
I. Standard of Review and Legal Standard
"We review an appeal from the Court of Federal Claims in a Vaccine Act case de novo, applying the same standard of review [as the Court of Federal Claims] applied in reviewing the special master's decision." Milik v. Sec'y of Health & Human Servs ., 822 F.3d 1367, 1375 (Fed. Cir. 2016) (citation omitted). "Although we review legal determinations without deference, we review the special master's factual findings under the arbitrary and capricious standard." Id. at 1376 (citation omitted). This standard is "uniquely deferential" and "difficult for an appellant to satisfy with respect to any issue, but particularly with respect to an issue that turns on the weighing of evidence by the trier of fact." Id. (internal quotation marks and citations omitted). "[A]s long as the special master's conclusion is based on evidence in the record *1361 that is not wholly implausible, we are compelled to uphold that finding as not being arbitrary or capricious." Id. (internal quotation marks, brackets, and citation omitted).
Where, as here, a petitioner alleges an injury not found on the Vaccine Injury Table ("the Table"),[3] they "must show that the vaccine was not only a but-for cause of the injury but also a substantial factor in bringing about the injury." Moberly , 592 F.3d at 1321 (internal quotation marks and citation omitted). To demonstrate causation, the petitioner's "burden is to show by preponderant evidence" each of the requirements set forth in Althen v. Secretary of Health and Human Services ("the Althen prongs"): "(1) a medical theory causally connecting the vaccination and the injury; (2) a logical sequence of cause and effect showing that the vaccination was the reason for the injury; and (3) a showing of a proximate temporal relationship between vaccination and injury." 418 F.3d 1274, 1278 (Fed. Cir. 2005). "If [the petitioner] satisfies this burden, she is entitled to recover unless the [G]overnment shows, also by a preponderance of evidence, that the injury was in fact caused by factors unrelated to the vaccine." Id. (internal quotation marks, brackets, and citation omitted).
II. The Court of Federal Claims Did Not Err in Sustaining the Chief Special Master's Determination
The Chief Special Master determined that the Olivers failed to satisfy their burden as to each of the Althen prongs. Oliver I , 2017 WL 747846, at *11-21. The Olivers aver that the Chief Special Master erred in her evaluation of the Althen prongs by: (1) "misappl[ying] Daubert [v. Merrell Dow Pharmaceuticals, Inc. , 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) ] and thus appl[ying] an evidentiary standard not in accordance with law," Appellants' Br. 17 (capitalization modified); see id. at *17-33 ; and (2) "improperly using estoppel and a faulty scientific premise to deny both a full and fair hearing, in an abuse of her discretion, as well as a finding of causation," id. at *34 (italics omitted); see id. at *34-43. We disagree with the Olivers.
First, although the Olivers claim that the Chief Special Master misapplied Daubert , their argument amounts to no more than a challenge to the weight afforded to their expert's testimony and supporting evidence.[4] See id. at *17-33. The Chief Special Master thoroughly evaluated both parties' evidence as to each Althen prong and found the Government's more persuasive. See *1362 Oliver I , 2017 WL 747846, at *11-21. For example, regarding the first Althen prong, the Chief Special Master found that "none of the articles cited by [the Olivers' expert] suggest that vaccines can cause ... or change the clinical course of Dravet syndrome, and several come to the opposite conclusion," whereas the Government's expert "provide[d] strong evidence [in the form of animal studies] that Dravet syndrome will develop in children with the SCN[1]A mutation, whether or not they receive vaccinations." Id. at *16 ; see id. at *11-16 (reviewing the parties' evidence as to the first Althen prong). In light of these findings, the Chief Special Master determined that the Olivers' expert "did not provide a 'sound and reliable' medical theory to explain how the vaccinations at issue cause Dravet syndrome." Id. at *16. The Chief Special Master made similar findings with respect to the second and third Althen prongs. See id . at *16-20 (reviewing the parties' evidence as to the second Althen prong), *20 (finding, with respect to the second Althen prong, that the Olivers' expert's testimony was "not persuasive" in light of the Government's expert's testimony and E.O.'s medical records, such that the Olivers "failed to prove by a preponderance of the evidence a logical sequence of cause and effect showing that the vaccines E.O. received caused his Dravet syndrome"), *20-21 (reviewing the parties' evidence as to the third Althen prong), *21 (finding, with respect to the third Althen prong, that, "[w]hile the proximity between vaccination and seizure onset might suggest a causal relationship between the two events, E.O. did not develop Dravet syndrome until ... more than a year after these vaccinations," such that the Olivers' evidence "[wa]s not sufficient to establish a causal link").
The Olivers repeatedly fault the Chief Special Master for failing to afford greater weight to their expert's testimony and supporting evidence. See, e.g. , Appellants' Br. 25 (stating that "the [Chief] Special Master is highly dismissive of all of [their expert]'s testimony"), 26 (stating that the Olivers' expert's "theory and ... mechanisms were, in fact, supported by the literature even if his conclusions were not yet published"), 33 (stating that the Chief Special Master "essentially reject[ed]" their expert's supporting evidence). We cannot review such challenges. See Milik , 822 F.3d at 1376 ("[W]e do not reweigh the factual evidence, assess whether the special master correctly evaluated the evidence, or examine the probative value of the evidence or the credibility of the witnesses-these are all matters within the purview of the fact finder." (internal quotation marks and citation omitted) ); Lampe v. Sec'y of Health & Human Servs. , 219 F.3d 1357, 1362 (Fed. Cir. 2000) (stating that "assessments of the credibility of the witnesses and the relative persuasiveness of the competing medical theories of the case" "are virtually unchallengeable on appeal"). Therefore, we hold that the Chief Special Master did not misapply Daubert in weighing the parties' experts' testimony and supporting evidence and that the Chief Special Master's factual findings were neither arbitrary nor capricious. See de Bazan v. Sec'y of Health & Human Servs. , 539 F.3d 1347, 1352 n.4 (Fed. Cir. 2008) (rejecting similar arguments on the grounds that " Daubert is inapposite here because the special master did not exclude any expert evidence under Daubert " and, instead, "admitted and weighed both parties' evidence but simply decided that the [G]overnment's evidence was more persuasive"); Terran ex rel. Terran v. Sec'y of Health & Human Servs. , 195 F.3d 1302, 1316 (Fed. Cir. 1999) (affirming a "[s]pecial [m]aster's *1363 analysis ... using Daubert [ ] ... as a tool or framework for conducting the inquiry into the reliability of the evidence," where the special master's "application of the Daubert factors [was] reasonable," because "[t]he [s]pecial [m]aster found that the Daubert inquiry raised serious questions about the [petitioner's expert's] testimony," such that "the proffered theory of causation was not sufficiently reliable").[5]
Second, the Chief Special Master did not apply estoppel to either deny a fair hearing or bar the Olivers' theory of causation. The Olivers assert that the Chief Special Master "effectively estopped the [Olivers] from fully presenting [their] case," Appellants' Br. 39, by noting that, "[t]o date, there have been at least [fifteen] other ... cases which involved children with SCN1A mutations[ ] and compensation has been denied in all of these cases," Oliver I , 2017 WL 747846, at *1 (footnote omitted); see id. at *1 n.3 (listing the prior cases); see also Estoppel , Black's Law Dictionary (10th ed. 2014) (defining estoppel as, inter alia, "[a] bar that prevents the relitigation of issues"). However, one reference to other cases rejecting similar claims does not constitute the application of estoppel. Cf. Waymo LLC v. Uber Techs., Inc. , 870 F.3d 1350, 1361 (Fed. Cir. 2017) ("We will not find legal error based upon an isolated statement stripped from its context." (internal quotation marks and citation omitted) ). Indeed, the Chief Special Master made no reference to estoppel, see generally Oliver I , 2017 WL 747846, and the Olivers concede that they cannot identify where the Chief Special Master applied *1364 estoppel to bar their claims, see Oral Arg. at 2:04-41 (acknowledging that the Chief Special Master's opinion did not apply equitable estoppel and failing to identify any authority for finding an improper application of equitable estoppel under those circumstances). As we explained above, the Chief Special Master thoroughly considered the parties' evidence and found the Government's more persuasive, Oliver I , 2017 WL 747846, at *11-27, and we may not reweigh that evidence on appeal, see Milik , 822 F.3d at 1376.[6]
CONCLUSION
We have considered the Olivers' remaining arguments and find them unpersuasive. Accordingly, the Judgment of the U.S. Court of Federal Claims is
AFFIRMED

According to a 2010 study on the relation between vaccination and Dravet syndrome, "Dravet syndrome, formerly severe myoclonic epilepsy of infancy (SMEI), is characterized by prolonged febrile seizures starting at about the age of [six] months." J.A. 1221. "Mutations in [the] SCN1A [gene] can be identified in the majority of patients, and epileptic seizures in the setting of fever are a clinical hallmark" of Dravet syndrome. J.A. 1221 (italics omitted).

The relevant facts and procedural history are largely undisputed and are set forth in the Chief Special Master's and Court of Federal Claims' decisions below. See Oliver II , 133 Fed.Cl. at 344-48 ; Oliver I , 2017 WL 747846, at *1-9. For convenience, we cite those opinions in outlining the undisputed facts relevant to this appeal.

The Table is published in 42 U.S.C. § 300aa-14. For injuries listed in the Table, i.e., "Table Injuries," "causation is presumed when a designated condition follows the administration of a designated vaccine within a designated period of time." Moberly ex rel. Moberly v. Sec'y of Health & Human Servs. , 592 F.3d 1315, 1321 (Fed. Cir. 2010). For "all other injuries alleged to be caused by a vaccine" that are not listed in the Table, i.e., "off-Table injuries," "causation must be proved in each case." Id. (citation omitted).

While the Chief Special Master referenced Daubert in the "Standards for Adjudication" section of her opinion, see Oliver I , 2017 WL 747846, at *10, she did not exclude either parties' evidence and made no reference to Daubert when weighing the parties' evidence to determine whether the Olivers had satisfied their burden of establishing each of the Althen prongs, see id. at *11-21. Nevertheless, the Government acknowledges that the Chief Special Master implicitly conducted a Daubert analysis in finding the Olivers' expert's testimony and supporting evidence unpersuasive. See Oral Arg. at 18:39-19:17, http://oralarguments.cafc.uscourts.gov/default.aspx?fl=2017-2540.mp3.

At oral argument, the Olivers asked the court to take judicial notice of an extra-record scientific article published in 2017 ("the 2017 Article"). Oral Arg. at 10:12-11:41; see Reply Br. 20 & n.8 (discussing Valentina Cetica et al., Clinical and Genetic Factors Predicting Dravet Syndrome in Infants with SCN1A Mutations , 88(11) Neurology 1037, 1037 (2017), available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5384833/ (exploring the "prognostic value of initial clinical and mutational findings in infants with SCN1A mutations" and concluding that, "[i]n individuals with SCN1A mutations, age at seizure onset appears to predict outcome better than mutation type" (italics omitted) ) ). The Olivers allege that this article demonstrates that one "can have the SCN1A [gene] and not develop Dravet syndrome" and that E.O.'s "vaccinationtriggered the onset of seizures within his first [twelve] months" and, thus, was a but-for cause of his injuries because it "did impact his clinical course." Reply Br. 21.
Scientific "theories that are so firmly established as to have attained the status of scientific law, such as the laws of thermodynamics, properly are subject to judicial notice under Federal Rule of Evidence 201." Daubert , 509 U.S. at 592 n.11, 113 S.Ct. 2786 ; see Fed. R. Evid. 201(b) ("The court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."). However, the Olivers have failed to establish that this theory has garnered such widespread acceptance, as evidenced by the Chief Special Master's extensive discussion of articles with contradictory findings. See, e.g. , Oliver I , 2017 WL 747846, at *15 (discussing "studies show[ing] that the occurrence of febrile seizures following vaccinations does not change the clinical course or outcome of Dravet syndrome"). Therefore, we decline to take judicial notice of the 2017 Article. See Brown v. Piper , 91 U.S. 37, 42-43, 23 L.Ed. 200 (1875) (explaining that a courts' power to take judicial notice "is to be exercised ... with caution," that "[c]are must be taken that the requisite notoriety exists," and that "[e]very reasonable doubt upon the subject should be resolved promptly in the negative"). To the extent the Olivers ask us to consider findings in the 2017 Article, "studies that were not before the [Chief S]pecial [M]aster are not appropriate for consideration on appellate review." Whitecotton ex rel. Whitecotton v. Sec'y of Health & Human Servs. , 81 F.3d 1099, 1104-05 (Fed. Cir. 1996) (citation omitted).

To the extent the Olivers contend that, even if the Chief Special Master did not improperly apply estoppel, the Chief Special Master abused her discretion by denying their request for an evidentiary hearing, see Appellants' Br. 39, we disagree. Special masters have "wide discretion" to determine whether to hold an evidentiary hearing. Burns ex rel. Burns v. Sec'y of Dep't of Health & Human Servs. , 3 F.3d 415, 417 (Fed. Cir. 1993) ; see 42 U.S.C. § 300aa-12(d)(3)(B)(v) (providing that the special master "may conduct such hearings as may be reasonable and necessary"); Rule 8(d) of App. B to the Rules of the Court of Federal Claims (permitting the special master to "decide a case on the basis of written submissions without conducting an evidentiary hearing"). Because the record was fully developed and the Olivers have not identified any factual or legal errors by the Chief Special Master that would have necessitated an evidentiary hearing, we conclude that the Chief Special Master acted within her discretion in denying the Olivers' request for such a hearing. See Burns , 3 F.3d at 417.